## CIRCUIT COURT OF FAIRFAX COUNTY

SoftPros, Inc.

   v.

Privacy Vaults Online, Inc.

May 14, 2009

Case No. CL 2008-3528

BY JUDGE JONATHAN C. THACHER

This matter came before the Court on competing claims for breach of contract. It was scheduled for a two day non-jury trial, and began on February 23, 2009. At the close of the second day, it was apparent the trial would take longer than estimated by counsel. The Court was unable to immediately accommodate the parties' need for additional time, but the Court took up the matter again on March 25 and, after an additional two days of trial, took the matter under advisement. After considering the evidence, the testimony, and the oral and written arguments of counsel, the Court finds the Defendant liable for breach of contract, does not find the Plaintiff liable on the counterclaim, and fixes Plaintiff's damages at $98,500.

*Factual Findings*

Plaintiff is a Georgia Corporation engaged in the business of software development and provided software development services for the Defendant. Plaintiff has a staff of about thirty in Atlanta, Georgia, and subcontracts a significant amount of its business to a corporation in India. It has available to it in India approximately one-hundred software engineers and programmers. Chand Akkineni is Plaintiff's CEO.

Defendant is a Delaware Corporation with its primary place of business in Virginia. Defendant is engaged in the business of helping various commercial entities comply with federal internet privacy protection laws.

Defendant directly employs no software engineers or programmers. Lynn Taylor is Defendant's Corporate Treasurer, and Denise Tayloe is Defendant's CEO.

Joseph Dickman is the Managing Director of an entity called AEM-Vizuri (AEM). AEM provided Defendant with software development and other services before Defendant's agreement with Plaintiff. During the pendency of the parties' agreement, AEM continued to provide some services, but less than before the parties entered their agreement. As of the trial, AEM continues to provide Defendant with software development and other services.

The general outline of the parties' relationship was as follows. Defendant contracted with its customers to assist them in complying with federal internet privacy laws. Because they do not have the ability to write software themselves, they subcontracted the actual software development to third parties such as the Plaintiff. For its part, Plaintiff then subcontracted the actual work of writing the software to its partners or affiliates in India.

The parties' initial agreement was reached in 2005. Before 2005, Defendant had contracted with other parties for software development, most recently with AEM. Although AEM continued to "host" Defendant's product on its servers, they had ceased active development work pending payment of past due accounts. Defendant hoped that its agreement with Plaintiff would significantly lower development costs.

Initially Plaintiff contracted to provide a specific piece of finished software (the "teacher's module") for a fixed price. The teacher's module was designed to allow a teacher to manage a large number of students using the internet in a classroom environment. In May 2006, the parties changed their arrangement from a fixed price model to what Plaintiff referred to as a "dedicated resource" or "time and materials" model. Only the initial fixed price contract for the teacher's module was reduced to writing. The dedicated resource arrangement and the "hibernate conversion" were oral agreements between the parties. Under the dedicated resource model, Plaintiff made available in India a specific number of personnel with specified qualifications for a flat monthly rate. The designated personnel would work for Defendant full time under the Defendant's direction. This arrangement gave the parties more flexibility and allowed Defendant to better control development costs.

Under this arrangement, Plaintiff was under no obligation to produce a particular piece of software at a given time. Instead the assigned personnel would simply get done as much work as they could in a month on whatever project or projects they were directed to work on. If Defendant had no work for them, Defendant was still obligated to pay the flat rate. Defendant for its part gained some assurance that its development costs would not exceed the

monthly rate. Although the number of personnel assigned and the rate varied, in October 2006, the arrangement stabilized at four personnel at a rate of $10,000 per month. The agreement was to continue until terminated by one party or the other.

Also in 2006, it became apparent that Defendants' software products ought to "migrate" from an underlying software product known as "Torque" to a similar, but apparently more advanced, product known as "Hibernate" (the Court will refer to this as the "Hibernate conversion").1 Defendant initially approached AEM about doing the conversion and AEM offered to do the work in two months for $50,000. Plaintiff offered to do it in two to three months for $22,500. Plaintiff's offer was accepted. According to the Plaintiff, the project was completed and the code delivered to Defendant in February 2007.

Defendant contends that the delivered code was fatally defective and that they permitted the Plaintiff to try to cure their failure to perform until October 2007. In October 2007, Defendant informed Plaintiff that they would not accept further invoices and that the decision included rejection of invoices retroactive to June 2007. Defendant then hired AEM to complete the conversion. Defendant alleges that AEM expended in excess of $200,000 to complete the task and alleges other damages stemming from the delay. Plaintiff responds that, under the contract, Defendant was responsible for testing the finished software, that they failed to do so, that they failed to reject it within a commercially reasonable time after delivery, and so accepted it.

*Analysis*

Although the facts are somewhat unusual, the matter raises no novel questions of law. The Court finds that the parties had three contracts. The first contract was a fixed price contract for delivery of the teacher's module. After delivery of that product, the relationship transitioned into a month to month contract for Plaintiff's team of "dedicated resources." Finally, the parties

---

[1] The Court will not explain what either product does, or why the "migration" was necessary. A public source description of the Hibernate product illustrates the futility of trying: "Hibernate is an object-relational mapping (ORM) library for the Java language, providing a framework for mapping an object-oriented domain model to a traditional relational database. Hibernate solves object-relational impedance mismatch problems by replacing direct persistence-related database accesses with high-level object handling functions." The Court sincerely thanks both parties for being able to agree that the migration was necessary.

entered a third agreement for the fixed price delivery of the Hibernate conversion product. There is no real dispute about the existence of any of the contracts. The parties do dispute the termination date of the month to month dedicated resources agreement and dispute the terms of and their respective performance of their obligations under the contract for the Hibernate conversion.

## A. *Termination of the Month to Month Dedicated Resource Agreement*

The Court finds that the termination date of the month to month dedicated resource agreement was October 15, 2007. According to the testimony of Defendant's Corporate Treasurer, Defendant's CEO instructed her on October 10, 2007, not to pay any invoices after June 30, 2007, and that she notified Plaintiff of that instruction on October 15, 2007. The Treasurer's testimony was substantiated by printed e-mail messages admitted into evidence. Although Defendant's CEO testified that she had verbally terminated the month to month agreement at an earlier date, her testimony was vague, contradicted by the testimony of Plaintiff's CEO, and is not consistent with the testimony of the Defendant's Treasurer. Accordingly the Court finds that the month to month agreement was terminated by Defendant October 15, 2007.

## B. *Performance of Obligations under the Hibernate Conversion Contract*

There is no serious dispute that Plaintiff delivered something on or about February 28, 2009. The dispute centers on whether what was delivered was so defective that it failed to satisfy Plaintiff's obligation under the contract. Defendant claimed it was fatally defective[2] and that they are not obligated to pay for a defective product. Plaintiff does not dispute that, if the code were fatally defective, they would be obligated to repair it, but replies that testing was Defendant's responsibility and that Defendant failed to test and accept or reject the product within a commercially reasonable time. Mr. Akkineni testified that thirty days was a commercially reasonable time. This testimony was not contradicted.

---

[2] Although this position was repeatedly shown to be inconsistent with prior statements by and the testimony of Mr. Dickman, Defendant's expert witness, it is, as the Court understands it, their position.

The significance of the code being tested in a reasonable time is that the software developer must design the code to work on a particular system or range of systems. Changes to the hardware or operating software of the system may well render an otherwise functioning software product useless. The Court notes that the parties' initial contract specified that the finished product would operate on a Windows NT machine and specified eight other specific versions of software that it would have to properly interact with. Testimony and admitted exhibits establish that Defendant's system in the United States deviated from at least two of the software specifications, and that Defendant's agents did not always timely communicate these changes to Plaintiff's development team in India. Changes may of course be made to update the product to operate the new system, but these changes take time and cost money. The developer bears the burden of ensuring the product works on the specified system, but the customer usually has to pay to have the product updated to work on other systems.

Defendant's CEO admitted on cross-examination that Defendant was unable to test the delivered code within thirty days. In fact, Defendant was unable to have the code tested in any meaningful way until early May 2007. At that point, Defendant had funds and was able to hire an expert to test the code. Ms. Taylor testified as to a number of reasons why the code was not tested when delivered, including lack of technical expertise, lack of funds to hire someone with expertise, and problems accessing the code at the hyperlink provided. Defendant appears to have not taken seriously their obligation to test the code in a commercially reasonable time. The Court finds that the terms of the contract required the Defendant to test the delivered code and that the contract required them to do so within a commercially reasonable time. The Court further finds that Defendant failed to do so. Because Defendant failed to test the code in a commercially reasonable time, as required by the contract, they accepted delivery of the product and are obligated to pay for it in accordance with the contract. Furthermore, Defendant's Treasurer candidly admitted in open Court that Defendant owed Plaintiff the amounts claimed. These facts compel the finding that Plaintiff is entitled to the full amount claimed. Because the Court finds that Defendant accepted delivery of the finished product, the counterclaims fail.